**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. ____________________

**ANDERS F. HILLSTROM,**
Plaintiff,

v.

**BOBI LIMON**, a Denver Police Officer, in his individual capacity;
**PRESTON RILEY**, a Denver Police Officer, in his individual capacity;
**JOSE BARAJAS**, a Denver Police Officer, in his individual capacity; and
**THE CITY AND COUNTY OF DENVER, COLORADO**,
Defendants.

---

## COMPLAINT AND JURY DEMAND

Plaintiff Anders F. Hillstrom, by and through his attorney, Baumgartner Law LLC, states and alleges as follows:

## I. INTRODUCTION

1. Shortly after midnight on August 15, 2024, Anders Hillstrom was standing on the grass of his own front yard, inside his own picket fence at 1510 W. Berkeley Place in Denver, Colorado. He was calm, peaceful, and fairly intoxicated. He was unarmed. He had committed no crime whatsoever.

2. When Denver Police Officer Limon came up the dirt path toward him, Mr. Hillstrom raised both hands above his shoulders, palms open and empty, and held them there. The officer's own body-worn camera recorded him doing so for approximately five continuous seconds.

3. Limon said, "What's up?" As Anders, hands still above his head, began to answer, "Oh, well…" Limon pressed forward more quickly, now with both hands pushing Anders

(whose hands are still up) and continuously pressed into the space Anders was calmly standing in. Limon was aggressively physically barreling through Anders with clear intent.

4. Understandably, Anders didn't understand this aggression from a police officer, and obviously thought Limon believed he was an intruder or a criminal. Anders slowly backed away, hands still above his head, and said, "Whoo, this is my house dude."

5. When Anders repeated immediately, "This is my house dude." his hands were still above his head, and he was obviously retreating out of fear. Anders said, "I just want to go into my house."

6. Limon accelerated his pace, increased the volume of his "Stop moving!" command, and simultaneously yelling, "Get on the ground!" while at the exact moment he violent shoved and tackled Mr. Hillstrom in his yard. Within about 1.8 seconds of first contact, Mr. Hillstrom was bent over double and driven face-first into the grass.

7. Limon attacked Mr. Hillstrom in only the way a school-yard bully attacks a helpless victim.

8. Officer Riley immediately jumped on Mr. Hillstrom as well, failing to intervene, or to deescalate in any way.

9. The officers would later perjure their official reports, stating that Anders was attempting to flee, somehow attacked them as he was fleeing, that he tried to kill them, and that they, naturally, feared for their life.

10. Those police officers cause Mr. Hillstrom to be charged with strangulation of a police officer, and attempted disarming of an officer. They piled on as many felony counts as they could.

11. Undersigned counsel sent one email to the felony division chief of the Denver District Attorney's office pointing out the officers' perjury. All charges – felony assault on two Denver cops - were immediately and unconditionally dismissed.

12. Upon information and belief, that Deputy DA is a conscientious man, and subjecting the officers to withering cross under oath played no part in the decision to dismiss these most heinous charges.

13. In the arrest affidavit and official reports that that followed, Defendants swore that Mr. Hillstrom immediately and aggressively assaulted them, and somehow at the same time, fled to the back of a shed, and that he strangled an officer in a "bear hug" that took the officer's breath away, and then astonishingly, that he reached for, grabbed, and attempted to disarm *both* officers, which, naturally, caused them to fear for their life. The officers were, in their sworn statements, lucky to escape the violent wrath of this predator with their lives.

14. The officers then authored written statements regarding their near-death experience in which they made a childish mockery of the events. The officers didn't simply parrot each other's reports, they then parodied a sophomoric, bizarre, and vulgar sex scene borrowed from a cheap romance novel, in which they likened their pistols to penises, and in which Mr. Hillstrom is lasciviously and sexually grabbing and tugging the officers' guns.

15. The BWCs, however, can be played back - frame - by - frame.

16. All experienced officers of the Court recognize the ubiquitous pretextual "stop resisting" command. It lost credibility at last in 2020 - when the public, armed with cell phone cameras, watched the slow murder of an intoxicated man in Minneapolis.

17. Members of the public used to plead, "He's not resisting!!" as police officers brutalized citizens. Now our youth has made a meme of this transparent lie, and even elementary school children now shout in the playground "Stop resisting!" whenever there is a physical confrontation. It is no childish matter. This transparent abuse of force caused our half of our nation to openly rebel in the summer of 2020.

18. "My Daddy changed the World!" was the heart wrenchingly hopeful and now sadly hopeless statement of a young black girl whose father was murdered by police who were trained by their city that repeating "Stop Resisting" was enough for any judge to grant them qualified immunity.

19. Mr. Hillstrom was arrested, booked, and charged without probable cause for arrest, and in frame-by-frame government assault on a man standing peacefully in his own yard. He spent nearly a year defending himself against the officers' sworn statements that the video plainly contradicts.

20. There was, it turns out, an outstanding Denver municipal court warrant for Mr. Hillstrom that night. Neither officer knew that. The Department's own Computer Aided Dispatch record for this call contains no warrant check and no warrant return before the seizure, and Officer Limon never told Mr. Hillstrom he was under arrest or that a warrant existed. Defendants learned of the warrant only after they had beaten him to the point that he was unrecognizable. A warrant nobody knew about cannot form the basis of a reasonable officer's conduct. It could not have entered into what a reasonable officer confronting Mr. Hillstrom would have perceived, because it was not among the facts confronting him.

21. This action seeks redress for the force used against a man who was surrendering in his own yard, and for the false sworn statements used to justify it.

22. Everyone reading this, knows what happened: Defendants were bored and looking for action. CIRSA and the City of Denver, and the large firms and organizations they hire, like "LEO" train officers every day that they can violate the rights of citizens with impunity, as long as they yell "stop grabbing my gun."

23. That gig was up when the world watched George Floyd slowly murdered for "resisting." No longer will novel pretextual lies - like loudly command "stop grabbing my gun" be swallowed by the public, district attorneys, lawyers of good conscience or our moderators of conflict - our judges. Juries have spoken more loudly, and with remarkable consistency: we will not tolerate continued violence by our government. We have cell phones.

24. The world did change, but not in the way Gianna Floyd hope.

25. "Stop resisting" has no more credibility. Now, police officers in Denver are trained by large law firms like SGR to instead yell, "Stop grabbing my gun!" Same pretext, but now higher stakes. The message is clear: don't back down – double down, and the judges will blindly grant immunity to violent officers. The argument: Citizens are more violent now. They are always grabbing police officers' guns, not just resisting.

26. Cities like Denver have never - not one time - admitted to police training causing constitutional violations. The response to the *Epps* verdict, for example, is to train our officers to scream more outrageous pretext for violence. Judges, after all, will believe police officers almost all of the time, even in the face of absurdity, frame-by-frame evidence, and even nation-wide upheaval.

27. To be clear, the City of Denver intentionally trains its officers to yell, "Stop grabbing my gun!' or "gun grab" and then to back up the other officer's perjury in their mirrored

statements, in order to justify the violent assault of citizens in violation of the US and Colorado constitutions.

28. This must stop. This Court is the place the United States Congress and the President appointed to stop this through the Ku Klux Klan act, 42 U.S.C. §1983. This Court. Now.

## II. JURISDICTION AND VENUE

29. This action arises under the Constitution and laws of the United States, including 42 U.S.C. § 1983. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343.

30. This Court has supplemental jurisdiction over Plaintiff's claims arising under C.R.S. § 13-21-131 and the Colorado Constitution pursuant to 28 U.S.C. § 1367(a), because those claims arise from the same case or controversy.

31. Venue is proper in the District of Colorado under 28 U.S.C. § 1391(b) because all Defendants reside in this District and all events giving rise to the claims occurred in this District.

32. No notice of claim is required. C.R.S. § 13-21-131(2)(a) provides that the Colorado Governmental Immunity Act does not apply to claims brought under that section.

## III. PARTIES

33. Plaintiff Anders F. Hillstrom is a citizen of the United States and, at all times relevant to this Complaint, a resident of the City and County of Denver, Colorado. He resided at 1510 W. Berkeley Place, Denver, Colorado.

34. Defendant [FIRST NAME] Limon was at all relevant times a duly sworn police officer employed by the Denver Police Department, acting under color of state law and within the

scope of his employment. He is sued in his individual capacity. He is a "peace officer" as defined by C.R.S. § 24-31-901(3).

35. Defendant [FIRST NAME] Riley was at all relevant times a duly sworn police officer employed by the Denver Police Department, acting under color of state law and within the scope of his employment. He is sued in his individual capacity. He is a "peace officer" as defined by C.R.S. § 24-31-901(3).

36. Defendant City and County of Denver, Colorado, is a municipal corporation organized under the laws of the State of Colorado. It operates the Denver Police Department and is the employer of Defendants Limon and Riley. It is a "person" subject to suit under 42 U.S.C. § 1983.

## IV. FACTUAL ALLEGATIONS

### *A. The 911 Call, the Dispatch, and What the Officers Were Actually Told*

37. On the evening of August 14, 2024 and into the early morning of August 15, 2024, Mr. Hillstrom and Lindsay Vardeman were at Mr. Hillstrom's residence at 1510 W. Berkeley Place in Denver.

38. Ms. Vardeman placed a call to 911. She did so because she believed Mr. Hillstrom, who had been drinking, intended to drive away in his truck with their dogs.

39. Before Ms. Vardeman placed that call, Mr. Hillstrom had already returned her car keys to her. She was free to leave and knew she was free to leave.

40. During the 911 call Ms. Vardeman stated, in substance, that Mr. Hillstrom was preventing her from leaving, because she wanted to take the couple's dogs with her, and Mr. Hillstrom

put the dogs in his truck. She was not stating that Mr. Hillstrom was physically restraining her. As she has since confirmed in writing, she "could have left at any time."

41. Ms. Vardeman also told responding officers that Mr. Hillstrom had at one point stood in her way. As she has since confirmed in writing, this referred to "a brief moment where I felt blocked," and Mr. Hillstrom "really was just trying to talk to me." They are a married couple who have been together since high school, with not violence at any time.

42. No weapon was reported. No injury was reported. No assault was reported.

43. When officers arrived, Ms. Vardeman was seated calmly beside her vehicle on the road, away from Mr. Hillstrom. She was not in distress, was not fleeing, and was certainly not being restrained or imprisoned.

44. The Denver Police Department created and maintained a Computer Aided Dispatch record of this call, designated CAD Event No. 24439320. The CAD record was made at or near the time of each entry, by persons with knowledge, in the regular course of the Department's regularly conducted activity.

45. The CAD record reflects that the call was dispatched as a domestic dispute with no violence and that Mrs. Vardeman was concerned that her husband would drive away after drinking. There was simply no allegation of any crime, and absolutely without a doubt, no indication of any municipal warrant. No information of a warrant. The officers would both lie about this in their reports, stating that they inquired over CAD about Mr. Hillstrom, and that they learned prior to arrival that he had a municipal "statewide extraditable" municipal warrant. Of course, there is no extradition within a state, and these statements reveal that both officers are creating pretext for their violent attack.

46. All communications by Denver PD are logged in the CAD reports. None of those indicate that the officers followed protocol and conducted a search of Mr. Hillstrom. Not one record.

47. Their CAD reports (computer-aided-dispatch) leave no doubt that both Defendants have falsified an official report and have done so to influence a judicial officer.

48. Certainly, more public dollars should be spent training officers that yelling pretextual nonsense doesn't change their CAD reports, because that is the indelible record of their communications. Pst, POST.

49. The CAD record contains no entry by any officer ever reflecting that any responding officer requested a warrant check on Mr. Hillstrom before he was seized.

50. The CAD record contains no entry reflecting that any responding officer received a warrant return, a records check result, or any advisement of an outstanding warrant before Mr. Hillstrom was seized.

51. Had any such check been requested or any such return been received before the seizure, it would have been recorded in the CAD record in the ordinary course. It was not. Pst, POST. More training is needed.

***B. The Approach into the Curtilage***

52. Mr. Hillstrom's front yard at 1510 W. Berkeley Place is enclosed by a picket fence. It is a beautiful border to a peaceful home, even if this night Mr. Hillstrom was not in perfect form.

53. It is curtilage protected by the Fourth Amendment.

54. Officer Limon's body-worn camera — an Axon Body 3, serial number X6033423S — recorded his approach. He exited his vehicle at approximately 00:02:02 on the device clock

and walked a dirt path along the picket fence. (He did not "query" Mr. Hillstrom's warrant status. Dispatch relays warrant checks, not post-hoc, invented "queries."

55. Defendants entered the enclosed front yard without a warrant, without consent, and without any exigency. Ms. Vardeman was safe and calm outside the yard. No one was reported to be in danger inside it.

56. Anders was peaceful, hands up, and said, "Oh, well…" before being waylaid.

57. Neither officer drew a weapon on approach — an objective indication that neither perceived a threat.

***C. Mr. Hillstrom Offered No Resistance, and Was Seized With Excessive Force Anyway***

58. At approximately 00:02:34 on the device clock, Mr. Hillstrom becomes clearly visible on the grass inside his fenced yard. His hands are coming up.

59. From approximately 00:02:35 to 00:02:39 — roughly five continuous seconds — Mr. Hillstrom stands with both hands raised, palms open and empty, stationary. His hands never drop below shoulder height.

60. No weapon is visible on Mr. Hillstrom at any point in the recording. Both of his hands are clearly illuminated and plainly empty.

61. Mr. Hillstrom did not advance on either officer. Frame-by-frame analysis of the recording at thirty frames per second shows the scaling of background objects increasing — meaning the officer was closing the distance aggressively, while Mr. Hillstrom was stationary or drifting backward within his own yard, and had no time to respond or comply to the contradictory orders. Again, more training is needed here by Denver, CIRSA, LEO, and SGR.

62. Mr. Hillstrom said, in substance, "This is my house, dude," and took two steps to the back, and the side, away from Limon's clear and imminent tackle.

63. The only command Officer Limon gave before using force was "Stop moving."

64. At approximately 00:02:39, Officer Limon's right hand enters the camera frame. It is open and empty.

65. Approximately one to two tenths of one second later, Officer Limon seized Mr. Hillstrom. Frame-by-frame review confirms that Mr. Hillstrom's hands were still raised at the moment of contact.

66. Officer Limon shouted "Get on the ground" simultaneously with the shove, not before it. No interval existed in which any person could have understood and complied with any order.

67. Officer Limon did not tell Mr. Hillstrom he was under arrest. He did not tell him there was a warrant. He gave no warning that force was about to be used. In fact, Mr. Hillstrom asked for many, many minutes, and many, many times over why he was under arrest.

68. No officer ever mentioned a warrant.

69. Limon and Riley simply lied, and they expect this Court to look the other way. The onus of probable cause for arrest and imprisonment does not lie with the citizen, it lies with the government to establish just and probable cause for seizure.

70. The Constitution states: "The right of the people to be secure in their persons , houses , papers , and effects, *against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause*, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." It does not state that the government has a right to search and seize citizens unless the citizens

can provide probable cause that the search or seizure is unreasonable. The Fourth Amendment prohibits government seizure unless the government can prove probable cause. The government will argue the opposite, but Article III Judges are not so easily fooled, and that is why this is petition filed in this sacrosanct forum.

71. By approximately 00:02:41 — roughly 1.8 seconds after first contact — Mr. Hillstrom had been bent double and driven face-first into the grass. This was not a controlled escort. It was a head-down violent pile-drive into the turf.
72. A second officer is visible at the fence line at 00:02:41 and did not intervene to stop the takedown.
73. Mr. Hillstrom did not strike, swing at, kick, or push either officer at any point before force was used against him, or after.
74. Mr. Hillstrom did not turn to run and did not attempt to leave his yard.
75. At the moment force was initiated, Mr. Hillstrom posed no threat to anyone, was not resisting, and was not attempting to flee. Mr. Hillstrom responded with far less that his legal right as an American.
76. No such concessions are required of any American standing peacefully on his own yard when assaulted by government violence. No such concessions would be given in Undersigned Counsel's yard.

***D. The Municipal Warrant Was Unknown to the Arresting Officers***

77. At the time Defendants seized Mr. Hillstrom, there was outstanding warrant against him in an Arvada municipal court. That matter was resolved by Undersigned Counsel years ago, and there was no outstanding arrest warrant ever seen by any law enforcement officer.
78. Neither Defendant knew of that warrant when they beat Mr. Hillstrom to a pulp.

79. Neither Defendant requested a warrant check on Mr. Hillstrom before seizing him. Neither received a warrant return before seizing him. No such request or return appears anywhere in CAD Event No. 24439320 before the time of the seizure.

80. No dispatcher, supervisor, or other officer communicated the existence of the warrant to either Defendant before the seizure. Neither Defendant was acting at the direction or request of any officer who knew of the warrant.

81. Defendant Limon did not tell Mr. Hillstrom that he was under arrest for a warrant ever. He did not tell Mr. Hillstrom that there was a warrant. He said only, “Stop moving,” and then “Get on the ground” as he was already using force.

82. Defendants learned of the municipal warrant only after Mr. Hillstrom had been seized, taken to the ground, restrained, and handcuffed.

83. The municipal warrant therefore formed no part of the facts and circumstances within Defendants’ knowledge at the moment they seized Mr. Hillstrom and formed no part of any justification for the force they used against him.

84. Both officers have committed POST DE-certifiable offenses by so lying. Undersigned will ensure they are decertified regardless of the outcome of this matter. No negotiation will persuade Plaintiff or this officer of the Court to “look the other way.”

85. An Arvada municipal court warrant is process issued for the least serious category of offense in Colorado. Even had Defendants known of it, it would not have supplied a basis for the force used here.

86. Whether probable cause existed depends upon “the facts known to the arresting officer at the time of the arrest.” *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004). An arresting officer’s state of mind is irrelevant “except for the facts that he knows.” *Id.* at 153. The

Fourth Amendment does not permit "the far less reliable procedure of an after-the-event justification for the arrest." *Beck v. Ohio*, 379 U.S. 89, 96 (1964).

87. Colorado law is written in the same terms. A peace officer may arrest a person when "[h]e has a warrant commanding that such person be arrested." C.R.S. § 16-3-102(1)(a). Defendants did not have a warrant. They were required to justify the seizure under § 16-3-102(1)(b) or (1)(c), each of which depends on what the officer perceived or knew.

88. Knowledge of the warrant is not imputed to Defendants, full stop. In this Circuit the collective knowledge doctrine requires "some communication between the officer or officers with probable cause and the officer who executes the stop or search," confirming that the officers are "functioning as a team." *United States v. Chavez*, 534 F.3d 1338, 1345 n.13 (10th Cir. 2008). There was no such communication here. The officers must demonstrate this aspect of their probable cause, not Mr. Hillstrom. They can't. It doesn't exist. Defendants simply lied. When their previous arrestees are interviewed, upon information and belief, this was not their first time.

### *E. The Prone Restraint, and the Camera That Stopped Recording*

89. Officer Limon's body-worn camera was displaced from his person during the takedown. From approximately 00:02:43 to 00:05:13 the recording is black or obscured. The camera lay in the grass.

90. As a result, approximately two minutes and thirty-two seconds of prone restraint — the entire period during which Defendants would later claim Mr. Hillstrom assaulted them and reached for a firearm — was not visually captured by that device.

91. Ms. Vardeman watched this entire period. She has stated in writing: "I saw him face down under two officers the entire time, he did not fight."

92. While Mr. Hillstrom was held face down, Officer Riley stated aloud, more than once, that Mr. Hillstrom should stop reaching for his gun.

93. Mr. Hillstrom immediately and repeatedly denied it. On the recording he says, "I don't know anything about your gun, bro." He also told the officers they were hurting him and hurting his arm.

94. Ms. Vardeman, who was watching, has stated in writing: "I was watching when one of them repeated that he should stop going for his gun, however I never saw him reaching for anything." She has further stated that Mr. Hillstrom "denied reaching for the gun several times, which is true."

95. To the extent Mr. Hillstrom's hand made any contact with Officer Riley's body, it was the incidental contact of a man being held face down on the ground with his arm being wrenched. He made no attempt to grab, unholster, or take any officer's firearm.

96. Put simply, once again, in the interests of abundant caution: the government must demonstrate a reason to seize a citizen, not the other way around. Defendants simply cannot do that, unless they wish to commit perjury in federal court – which Plaintiff and this officer of the Court will meet head on.

97. Defendants applied force and pressure to Mr. Hillstrom while he was helpless, prone, handcuffed or being handcuffed, and not resisting.

98. At all relevant times, C.R.S. § 18-1-707(2.7), effective June 3, 2024, and Denver Police Department Operations Manual § 105.01(5)(e)(2)–(3) restricted the use of prone restraint and positional pressure.

99. Mr. Hillstrom suffered physical injury as a result of the takedown and the prone restraint. [SPECIFY INJURIES AND TREATMENT.]

***F. The Arrest Affidavit***

100. Following the arrest, Defendant Jose Torres Baraja swore and submitted an arrest affidavit in support of the criminal charges filed against Mr. Hillstrom in *People v. Hillstrom,* Denver District Court Case No. D0162024CR004858 (24CR4858).

101. Mr. Hillstrom was charged with three felonies, and three misdemeanors.

102. Defendant Barajas knew the facts and statements he swore out that formed the basis of all of these charges were false. Defendant Barajas' entire affidavit is intentionally and must be excised. All of it.

103. By way of example, the body-worn camera recording shows no strike, swing, or aggressive movement by Mr. Hillstrom at any point before force was used against him or after.

104. The affidavit stated that Mr. Hillstrom reached for and grabbed officers' guns. That statement was false. Mr. Hillstrom made no attempt to reach for any officer's firearm. He denied it contemporaneously on the recording, and the only civilian eyewitness — who was watching throughout — saw no such reach.

105. The affidavit stated that Mr. Hillstrom committed a "bear hug" causing loss of breath" to Limon. That statement was false. No such contact occurred. Defendant Barajas knew that when he perjured hi affidavit. Pst, POST.

106. The affidavit stated: that Mr. Hillstrom attempt to flee. That statement was false. Mr. Hillstrom was stationary or moving backward within his own fenced yard. He never

turned to run. The complaining witness has confirmed that he “did not turn to run or make any sudden movements.” Defendant Barajas knew that. Pst, POST.

107. The affidavit stated: a lawful order given and disobeyed. That statement was false or materially misleading. The only pre-force command was “Stop moving,” and the seizure was simultaneous with it. No opportunity to comply existed. Defendant Barajas knew that. Pst, POST.

108. The affidavit omitted that Mr. Hillstrom stood with both hands raised above his shoulders, palms open and empty, for approximately five continuous seconds immediately before he was seized. Defendant Barajas knew that. Pst, POST.

109. The affidavit omitted that Mr. Hillstrom was inside the enclosed curtilage of his own home when Defendants entered and seized him. Defendant Barajas knew that. Pst, POST.

110. The affidavit omitted that no weapon was visible on Mr. Hillstrom at any time. Defendant Barajas knew that. Pst, POST.

111. The affidavit omitted that Officer Limon shouted “Get on the ground” simultaneously with, rather than before, using force. Defendant Barajas knew that. Pst, POST.

112. The affidavit omitted that the encounter had been recorded by the affiant’s own body-worn camera and omitted that the recording had been interrupted when the camera was displaced during the takedown. Defendant Barajas knew that. Pst, POST.

113. The affidavit omitted every material fact of officer misconduct. Defendant Barajas knew that. Pst, POST.

114. [The affidavit stated or implied that the contact with and arrest of Mr. Hillstrom was predicated in whole or in part on an outstanding warrant: “[QUOTE VERBATIM].” That statement was false. Neither Defendant knew of any warrant when Mr. Hillstrom was seized. A statement by an affiant about the basis on which he himself acted concerns a fact uniquely within his own knowledge and cannot have been made negligently.

115. The affidavit stated that Defendants learned of the municipal warrant before arriving at Mr. Hillstrom’s home. That is false. Defendant Barajas knew that. Pst, POST.

116. Any reasonable officer would have known that each of the omitted facts set out above was the kind of fact a judicial officer assessing probable cause would wish to know.

117. Each Defendant knew the foregoing statements were false when made or made them with reckless disregard for their truth. Each Defendant personally participated in the events described, perceived them directly, and had access to the body-worn camera recording that contradicts the statements.

118. With the false statements removed and the omitted material facts restored, the affidavit describes an unarmed, intoxicated man standing inside the fenced front yard of his own home with both hands raised in surrender, who was seized without warning and driven face-first into the ground. So corrected, the affidavit does not establish probable cause for any charge at all.

119. The hard truth is that three officers will lose their POST certification. So will any sworn officer of the law that aids in the continuing false statements they have made. Any officer.

### *G. The Prosecution and Its Termination*

120. Mr. Hillstrom was arrested, booked into custody, and charged as a direct and proximate result of the false affidavit.

121. The legal process that followed Mr. Hillstrom's warrantless arrest rested entirely on the sworn statements of Defendants and did nothing to satisfy the probable cause requirement of the Fourth Amendment.

122. Mr. Hillstrom was required to appear in court on multiple occasions, to retain counsel, and to defend himself against felony charges over a period of approximately eleven months.

123. On May 19, 2025, Ms. Vardeman — the complaining witness — provided a written statement retracting or materially narrowing every fact that had supported the charges.

124. On July 24, 2025, the People of the State of Colorado moved to dismiss 24CR4858 in its entirety, stating: "After further review and investigation, the People are unable to prove this case beyond a reasonable doubt."

125. The court dismissed 24CR4858. Mr. Hillstrom was never convicted of any offense arising out of the events of August 15, 2024.

126. The prosecution of Mr. Hillstrom terminated without a conviction.

127. As a direct and proximate result of Defendants' conduct, Mr. Hillstrom suffered physical injury and pain from the takedown and the prone restraint; the invasion of the curtilage of his own home; humiliation and dignitary harm inflicted in front of his neighbors and in his own front yard; damage to his reputation; the costs of defending a criminal prosecution built on false sworn statements; and severe emotional distress.

128. These injuries flow from the force used against Mr. Hillstrom and from Defendants' false sworn statements and their conspiracy to make those felonious and perjurious statements. They are independent of, and were not caused by, the outstanding municipal warrant of which Defendants were entirely, completely unaware. Plaintiff invites Defendants to "double down" here and now.

***H. Municipal Policy, Custom, and Failure to Train***

129. Upon information and belief, the City and County of Denver has failed to adequately train, supervise, and discipline its officers regarding the use of force against persons who are not resisting, not fleeing, and not posing a threat.

130. Upon information and belief, the City and County of Denver has failed to adequately train, supervise, and discipline its officers regarding the accurate preparation of sworn arrest affidavits and the duty to disclose exculpatory facts within an officer's personal knowledge.

131. Upon information and belief, the City and County of Denver has failed to adequately train, supervise, and discipline its officers regarding the securing and preservation of body-worn camera recordings, including during physical encounters in which a camera may be displaced.

132. Upon information and belief, prior incidents, litigation, settlements, judgments, and Office of the Independent Monitor findings placed the City and County of Denver on actual or constructive notice of these deficiencies, and the City was deliberately indifferent to the obvious risk that they would result in constitutional violations.

133. The City of Denver pays for its officers to be trained to lie by large law firms, CIRSA representatives, and many more entities.

134. This allegation will not be denied by the City, or by SGR attorneys assigned to the case to cover their assignments.

135. These policies, customs, and failures were a moving force behind the violations of Mr. Hillstrom's rights alleged in this Complaint.

***I. Missing Body-Worn Camera Footage***

136. Colorado law provides that where a peace officer fails to activate a body-worn camera, fails to record an incident, or tampers with a recording, and the officer is subject to an allegation of misconduct, there is a permissive inference in any civil proceeding that the missing recording would have reflected misconduct. C.R.S. § 24-31-902(1)(a)(III).

137. The unrecorded portion of this incident encompasses precisely the conduct Defendants swore to and that the recording would have refuted or confirmed.

138. Plaintiff is entitled to the permissive inference provided by C.R.S. § 24-31-902(1)(a)(III) as to the unrecorded period.

## V. CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

### 42 U.S.C. § 1983 — Excessive Force in Violation of the Fourth Amendment

*(Against Defendants Limon and Riley)*

139. Plaintiff incorporates by reference each of the foregoing paragraphs as though fully set forth herein.

140. At all relevant times Defendants acted under color of state law.

141. The seizure of Mr. Hillstrom was a seizure within the meaning of the Fourth Amendment.

142. The force Defendants used — seizing a man whose hands were raised in surrender and driving him face-first into the ground without warning, followed by prone restraint — was objectively unreasonable under the totality of the circumstances.

143. Each Graham factor favors Mr. Hillstrom. The suspected offense was, at most, a non-violent misdemeanor. Mr. Hillstrom posed no immediate threat to anyone; he was unarmed, his hands were raised and empty, and no officer had drawn a weapon. He was neither resisting nor attempting to evade arrest by flight.

144. In assessing reasonableness, this Court must consider the totality of the circumstances, including the facts and events leading up to the moment force was used, and may not confine its review to the final moments of the encounter. Barnes v. Felix, 605 U.S. ___, 145 S. Ct. 1353 (2025).

145. Defendants' own conduct created any need for force that existed. They entered an enclosed private yard without warrant or exigency, closed the distance on a man who was surrendering, and used force before any command could be obeyed.

146. Defendants gave no warning and no meaningful opportunity to comply before using force.

147. The outstanding municipal warrant, unknown to Defendants, does not bear on this claim. The reasonableness of force is judged "in light of the facts and circumstances confronting" the officer. Graham v. Connor, 490 U.S. 386, 397 (1989). A warrant of which Defendants were unaware confronted them with nothing, and the offense underlying it cannot be counted toward the severity of "the crime at issue." Id. at 396.

148. In any event, the lawfulness of an arrest and the reasonableness of the force used to effect it are "separate and independent" inquiries in this Circuit. Cortez v. McCauley, 478 F.3d 1108, 1127 (10th Cir. 2007) (en banc). Even a concededly lawful arrest, and even an arrest on a valid warrant, may be carried out with unconstitutionally excessive force. This claim does not depend on the lawfulness of the arrest.

149. The law was clearly established well before August 15, 2024 that a takedown maneuver is unconstitutional when the arrestee poses no threat, puts up no resistance, and does not attempt to flee. Morris v. Noe, 672 F.3d 1185 (10th Cir. 2012); *Surat v. Klamser*, 52 F.4th 1261 (10th Cir. 2022); *Cavanaugh v. Woods Cross City*, 625 F.3d 661 (10th Cir. 2010); *Emmett v. Armstrong*, 973 F.3d 1127 (10th Cir. 2020); *Fogarty v. Gallegos*, 523 F.3d 1147, 1160 (10th Cir. 2008).

150. As a direct and proximate result, Mr. Hillstrom suffered the injuries and damages alleged above.

## <u>SECOND CLAIM FOR RELIEF</u>

**42 U.S.C. § 1983 — Unlawful Entry into Curtilage in Violation of the Fourth Amendment**

*(Against Defendants Limon and Riley)*

151. Plaintiff incorporates by reference each of the foregoing paragraphs as though fully set forth herein.

152. The fenced front yard of 1510 W. Berkeley Place is curtilage entitled to the same Fourth Amendment protection as the home itself. Florida v. Jardines, 569 U.S. 1 (2013); Collins v. Virginia, 584 U.S. 586 (2018). Its enclosure is dispositive. United States v. Vasquez, No. 22-1294 (10th Cir. Jan. 3, 2024).

153. Defendants entered that curtilage without a warrant, without consent, and without any recognized exception to the warrant requirement.

154. No emergency existed. The complaining witness was outside the yard, calm, uninjured, and free to leave. No weapon had been reported.

155. Even if an initial entry could be justified, Defendants' conduct exceeded the permissible manner and scope of any such entry.

156. The municipal warrant does not supply a justification. Defendants did not know of it, did not possess it, and did not enter the curtilage to execute it. A warrant unknown to the officer is not among "the facts known to the arresting officer at the time." Devenpeck v. Alford, 543 U.S. 146, 152 (2004). Colorado law is to the same effect: an officer may arrest where "[h]e has a warrant." C.R.S. § 16-3-102(1)(a).

157. Nor may the warrant be invoked through the doctrine of attenuation. That doctrine is an exception to the judicially created exclusionary rule, which "is not a personal constitutional right of the party aggrieved" and does not apply in an action for damages under 42 U.S.C. § 1983. See Utah v. Strieff, 579 U.S. 232 (2016) (suppression); Hudson v. Michigan, 547 U.S. 586 (2006); Townes v. City of New York, 176 F.3d 138, 145 (2d Cir. 1999); Lingo v. City of Salem, 832 F.3d 953 (9th Cir. 2016). In Strieff the officer learned of the warrant before arresting. Here nothing intervened between the unlawful entry and the seizure, because Defendants learned of the warrant only afterward.

158. As a direct and proximate result, Mr. Hillstrom suffered the injuries and damages alleged above.

## THIRD CLAIM FOR RELIEF

**42 U.S.C. § 1983 — Failure to Intervene in Violation of the Fourth Amendment**

*(Against All Defendants)*

159. Plaintiff incorporates by reference each of the foregoing paragraphs as though fully set forth herein.

160. Each Defendant was present at the scene, observed the use of force by the other, and had a realistic opportunity to intervene to prevent or stop it.

161. Each Defendant conspired to falsify their sworn statements.

162. No Defendant intervened.

163. A law enforcement officer who observes a fellow officer using excessive force or otherwise violating constitutional rights and has a realistic opportunity to intervene has a clearly established duty to do so.

164. As a direct and proximate result, Mr. Hillstrom suffered the injuries and damages alleged above.

## FOURTH CLAIM FOR RELIEF

**42 U.S.C. § 1983 — Unconstitutional Prone Restraint in Violation of the Fourth Amendment**

*(Against Defendants Limon and Riley)*

165. Plaintiff incorporates by reference each of the foregoing paragraphs as though fully set forth herein.

166. After Mr. Hillstrom was on the ground and under the control of two officers, Defendants continued to apply force and pressure to him while he was prone.

167. Mr. Hillstrom was not resisting. The only civilian eyewitness has stated that he was "face down under two officers the entire time" and "did not fight."

168. The continued application of pressure to a prone, restrained, non-resisting person is objectively unreasonable and was clearly established as such long before August 15, 2024.

169. Defendants' conduct also contravened C.R.S. § 18-1-707(2.7) and Denver Police Department Operations Manual § 105.01(5)(e)(2)–(3), both in force on the date of the incident.

170. As a direct and proximate result, Mr. Hillstrom suffered the injuries and damages alleged above.

## FIFTH CLAIM FOR RELIEF

### 42 U.S.C. § 1983 — Malicious Prosecution and Unlawful Continued Seizure in Violation of the Fourth Amendment

*(Against All Defendants)*

171. Plaintiff incorporates by reference each of the foregoing paragraphs as though fully set forth herein.

172. Defendants caused Mr. Hillstrom's continued confinement and prosecution by swearing and submitting an arrest affidavit containing statements they knew to be false, or made with reckless disregard for the truth, and by omitting material facts within their personal knowledge.

173. The legal process that followed Mr. Hillstrom's warrantless arrest — the filing of charges and the imposition of pretrial restraints on his liberty — rested on that false affidavit and did nothing to satisfy the probable cause requirement.

174. No probable cause supported Mr. Hillstrom's arrest, his continued confinement, or his prosecution. Probable cause must be assessed charge by charge, and the presence of probable cause as to any one charge does not defeat this claim as to the others. *Chiaverini v. City of Napoleon,* 602 U.S. 556 (2024).

175. The outstanding municipal warrant did not supply probable cause. Probable cause depends upon "the facts known to the arresting officer at the time of the arrest," *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004), and an officer's state of mind is irrelevant only "except for the facts that he knows," *id.* at 153. Defendants did not know of the warrant. The Fourth Amendment does not permit "after-the-event justification for the arrest." *Beck v. Ohio*, 379 U.S. 89, 96 (1964).

176. Knowledge of the warrant is not imputed to Defendants. The collective knowledge doctrine requires "some communication between the officer or officers with probable cause and the officer who executes the stop or search." *United States v. Chavez*, 534 F.3d 1338, 1345 n.13 (10th Cir. 2008). No officer communicated the warrant to Defendants before the seizure, and CAD Event No. 24439320 records no warrant check and no warrant return before that moment.

177. Defendants acted with malice. They fabricated an account of an assault, a flight attempt, and a reach for a firearm in order to justify force they had already used against a man who was standing in his own yard with his hands raised in surrender.

178. The prosecution terminated in Mr. Hillstrom's favor on July 24, 2025, when the People moved to dismiss and the case was dismissed without a conviction. A plaintiff "need only show that his prosecution ended without a conviction." *Thompson v. Clark*, 596 U.S. 36, 39 (2022); *accord Shrum v. Cooke,* 60 F.4th 1304 (10th Cir. 2023).

179. Mr. Hillstrom sustained damages, including loss of liberty, the costs of defending the criminal case, reputational harm, humiliation, and emotional distress.

180. The right not to be arrested, detained, and prosecuted on the basis of knowingly or recklessly false statements in a sworn affidavit was clearly established long before August 15, 2024. *Franks v. Delaware*, 438 U.S. 154 (1978); *Pierce v. Gilchrist*, 359 F.3d 1279 (10th Cir. 2004); *Wilkins v. DeReyes*, 528 F.3d 790, 799 (10th Cir. 2008); Puller v. Baca, 781 F.3d 1190 (10th Cir. 2015).

## SIXTH CLAIM FOR RELIEF

### 42 U.S.C. § 1983 — Fabrication of Evidence in Violation of the Fourteenth Amendment

*(Against All Defendants)*

181. Plaintiff incorporates by reference each of the foregoing paragraphs as though fully set forth herein.

182. Defendants knowingly fabricated evidence, namely the sworn statements identified above describing an assault on a peace officer, a reach for an officer's firearm, a "bear hug" causing an officer to lose his breath, an attempt to flee, and a lawful order given and disobeyed. None of those events occurred.

183. That fabricated evidence was used against Mr. Hillstrom. It was submitted to a judicial officer, it formed the basis of the decision to charge him in 24CR4858, and it was relied upon throughout the pendency of that prosecution.

184. The use of the fabricated evidence deprived Mr. Hillstrom of liberty, including through his arrest, his booking, the restraints imposed as conditions of his pretrial release, and the eleven-month prosecution he was forced to defend.

185. No conviction or sentence exists to be invalidated. The prosecution was dismissed on the People's own just motion on July 24, 2025.

186. The prohibition on the knowing or reckless falsification or omission of evidence was firmly established decades before August 15, 2024. *Bledsoe v. Carreno*, 53 F.4th 589 (10th Cir. 2022); *Pierce v. Gilchrist*, 359 F.3d 1279 (10th Cir. 2004); *Warnick v. Cooley*, 895 F.3d 746 (10th Cir. 2018).

187. As a direct and proximate result, Mr. Hillstrom suffered the injuries and damages alleged above.

## SEVENTH CLAIM FOR RELIEF

**42 U.S.C. § 1983 — Fabrication of Evidence in Violation of the Fourth Amendment**

*(Against All Individual Defendants — Pleaded in the Alternative)*

188. Plaintiff incorporates by reference each of the foregoing paragraphs as though fully set forth herein.

189. Defendants' fabrications caused Mr. Hillstrom's wrongful detention without probable cause, in violation of the Fourth Amendment.

190. Applying the corrected affidavit test — removing the false statements, restoring the omitted material facts, and asking whether the modified affidavit establishes probable cause — the affidavit as corrected does not establish probable cause for any charge filed against Mr. Hillstrom. *Puller v. Baca,* 781 F.3d 1190, 1197 (10th Cir. 2015); *Stonecipher v. Valles,* 759 F.3d 1134 (10th Cir. 2014).

191. The corrected affidavit cannot be rehabilitated by the municipal warrant. The warrant was unknown to Defendants at the time of the seizure and so formed no part of the facts on which they acted. To the extent the affidavit asserted the warrant as a basis for the contact or the arrest, that assertion was itself false and must be removed at step one of the corrected affidavit analysis.

192. As a direct and proximate result, Mr. Hillstrom suffered the injuries and damages alleged above.

## EIGHTH CLAIM FOR RELIEF

### 42 U.S.C. § 1983 — Municipal Liability

*(Against Defendant City and County of Denver)*

193. Plaintiff incorporates by reference each of the foregoing paragraphs as though fully set forth herein.

194. The violations of Mr. Hillstrom's constitutional rights alleged above were caused by the policies, customs, and practices of the City and County of Denver, and by its failure to adequately train, supervise, and discipline its police officers.

195. Denver was deliberately indifferent to the known or obvious consequences of those failures, including the obvious risk that officers would use unreasonable force against non-

resisting persons, would swear to false accounts to justify that force, and would fail to preserve body-worn camera evidence of it.

196. Those policies, customs, and failures were a moving force behind the violations of Mr. Hillstrom's rights.

197. As a direct and proximate result, Mr. Hillstrom suffered the injuries and damages alleged above.

## NINTH CLAIM FOR RELIEF

### C.R.S. § 13-21-131 — Deprivation of Rights Secured by Article II of the Colorado Constitution

*(Against All Defendants)*

198. Plaintiff incorporates by reference each of the foregoing paragraphs as though fully set forth herein.

199. Defendants are peace officers as defined by C.R.S. § 24-31-901(3), and at all relevant times acted under color of law.

200. Defendant City of Denver directed, caused, and/or was deliberately indifferent to the policies individual defendants carried out.

201. By the conduct alleged above, Defendants subjected Mr. Hillstrom to, and caused him to be subjected to, the deprivation of rights secured by Article II of the Colorado Constitution, including his right under Article II, Section 7 to be free from unreasonable searches and seizures.

202. Each Defendant is additionally liable under C.R.S. § 13-21-131(1) for failing to intervene to prevent the other's deprivation of those rights.

203. Qualified immunity is not a defense to liability under C.R.S. § 13-21-131(2)(b), and the Colorado Governmental Immunity Act does not apply.

204. Mr. Hillstrom is entitled to compensatory damages and, as a prevailing plaintiff, to reasonable attorney fees and costs pursuant to C.R.S. § 13-21-131(3).

## VI. PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Anders Hillstrom respectfully requests that this Court enter judgment in his favor and against Defendants, and award:

a. Compensatory damages in an amount to be determined at trial, including damages for physical injury and pain and suffering, the unreasonable invasion of the curtilage of his home, humiliation and dignitary harm, reputational harm, loss of liberty, the costs of defending the criminal prosecution, and emotional distress;

b. Nominal damages, at a minimum, for the deprivation of his constitutional rights;

c. Punitive damages against Defendants Limon and Riley in their individual capacities in an amount sufficient to punish and deter;

d. Reasonable attorney fees and costs pursuant to 42 U.S.C. § 1988 and C.R.S. § 13-21-131(3);

e. Pre-judgment and post-judgment interest at the maximum lawful rate;

f.

g. Such other and further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted this 14th day of August, 2026.

BAUMGARTNER LAW LLC

*s/ Birk Baumgartner*
Birk Baumgartner, Reg. No. 47829
Equitable Building
730 17th Street, Suite 340
Denver, CO 80202
Telephone: (303) 529-3476
Facsimile: (720) 634-1018
birk@baumgartnerlaw.com
*Attorneys for Plaintiff*